UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.   03-20774-CR-MORENO

UNITED STATES OF AMERICA,

v.

GILBERTO RODRIGUEZ-OREJUELA,

        Defendant.

_____/

### GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S
### MOTION FOR COMPASSIONATE RELEASE

The United States of America, by and through the undersigned Assistant United States Attorney, hereby responds to defendant Gilberto Rodriguez-Orejuela's motion for compassionate release and supplement thereto (DE310, DE311).   As the Defendant has not established extraordinary and compelling reasons for a sentence reduction or otherwise shown that he is entitled to relief, the motion for compassionate release should be denied.

### GENERAL BACKGROUND

Gilberto Rodriguez-Orejuela was a co-founder and high-ranking leader of the Cali Cartel, a large criminal organization that was responsible for sending thousands of kilograms into the United States (DE33:62, 82; DE264:43).   Over many years, Rodriguez-Orejuela, and his brother Miguel, were named in a number of indictments in the United States.   For example, in March of 1987, Gilberto and Miguel Rodriguez-Orejuela were indicted in the Eastern District of Louisiana on various drug charges relating to the importation of hundreds of pounds of cocaine in the early 1980's (Case No. 87-0346).   In 1991, Gilberto Rodriguez-Orejuela, and others, were indicted on a money laundering conspiracy in the Southern District of Florida (Case No. 91-0115-Cr-

Roettger).   In 1995, the Rodriguez-Orejuela brothers, along with many other members of the Cali

Cartel, were indicted a superseding indictment returned in the Southern District of Florida (Case

93-470-Cr-Hoeveler(S)(S)(S)).   In total, approximately 100 cartel members were successfully

prosecuted in the United States and Colombia (DE33:62).  Approximately 75 members of the

Cartel were prosecuted and convicted in the United States (DE33:64-65).   But the Rodriguez-

Orejuela brothers were not among those tried in the United States during the 1990's.   For years,

the Rodriguez-Orejuela brothers waged a multi-faceted campaign to avoid prosecution and

extradition to the United States (DE33:68).    In affirming the convictions of two of the Cartel's

attorneys, the Eleventh Circuit Court of Appeals explained part of the scheme as follows:

> [L]eaders of the Cartel maintained a strict code of silence among their employees.
> Employees were told not to cooperate with authorities if employees were ever
> arrested. To maintain this code of silence the Cartel utilized a carrot-and-stick
> approach. On the one hand, the Cartel paid the attorney's fees of members and
> expenses for those members' families and, on the other hand, threatened those
> employees who were arrested and their families with injury or death if they
> cooperated with authorities.

> [Miguel] Rodriguez-Orejuela also conducted an active campaign of collecting
> sworn statements from his employees to shield himself from prosecution or
> extradition to the United States. Members or employees of the Cartel apprehended
> by police would often soon thereafter sign affidavits disavowing knowledge of, or
> involvement with, Rodriguez-Orejuela, who was often named as a codefendant in
> prosecutions of persons apprehended by United States' authorities.

> Later this program expanded to include taking deposition testimony from certain
> people who had been arrested in the United States. During deposition, they would
> give statements similar in nature to the statements in the affidavits. Persons were
> picked to give such deposition testimony based on the degree to which Rodriguez-
> Orejuela was implicated in their case by other evidence and by the degree to which
> he thought that the person would provide answers favorable to Rodriguez-Orejuela.

United States v. Abbell, 271 F.3d 1286, 1291 (11th Cir. 2001).

In 1995, the Rodriguez-Orejuela brothers were arrested and incarcerated in Colombia

(DE33:64, 83).   At that time, the Colombia constitution prohibited the extradition of its nationals

(DE196:3).1 Notwithstanding their incarceration in Colombia, the Rodriguez-Orejuela brothers continued to conduct criminal activities (DE33:63, 76-77. 80-81, 88-89). They also continued their practice of paying family members of arrested employees to ensure loyalty (DE33:86-88, 90, 109-111). As a result of a change in the Colombia Constitution and further investigation into the continued criminal activities, the United States obtained an indictment and superseding indictment in Case No. 03-20774-Cr-Moreno, and Gilberto Rodriguez-Orejuela was extradited to the United States in 2004 (DE33:63-64, DE34, DE36).

## COURSE OF PROCEEDINGS

On January 22, 2004, a federal grand jury sitting in the Southern District of Florida returned a four-count count superseding indictment charging Gilberto Rodriguez-Orejuela, his brother, Miguel Rodriguez-Orejuela, and other individuals, for various narcotics related offenses and also with conspiring to corruptly and by threats of force or violence impede justice (DE21). Count 1 charged Gilberto Rodriguez and others with conspiracy to import five kilograms of more of cocaine into the United States, in violation of 21 U.S.C. §952(a); all in violation of 21 U.S.C. §§963 and 960(b)(1)(B) (DE21). Count 2 charged Gilberto Rodriguez-Orejuela and others with conspiracy to possess with the intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §841(a)(1); all in violation of 21 U.S.C. §§846 and 841(b)(1)(A)(ii) (DE21). Count 3 charged Gilberto Rodriguez-Orejuela and others with conspiracy to money launder, in violation of 18 U.S.C. §§1956(a)(1)(A)(i) and 1956(a)(1)(B)(i); all in violation of 18 U.S.C. §1956(h) (DE21). Count 4 charged a conspiracy to commit offenses against the United States, that is, to corruptly and by threats and force, influence, obstruct and impede the due administration of justice,

---

1 In 1997, Colombia amended its constitution, effective December 17, 1997, to permit the extradition of its nationals for crimes committed after the effective date (DE196:3).

in violation of 18 U.S.C. §1503; to kill other persons with the intent to prevent the attendance and testimony of any person in official proceedings, in violation of 18 U.S.C. §1512(a)(1)(A); and to kill other persons with the intent to prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission and possible commission of a Federal offense, in violation of 18 U.S.C. §1512(a)(1)(C) (DE21).2   The overt acts listed in Count 4 included ordering the murders of several persons (DE21:7-8).

On September 26, 2006, Gilberto Rodriguez-Orejuela, pursuant to a written plea agreement, entered a guilty plea to Count 1 of the Superseding Indictment which charged him with conspiracy to import five kilograms or more of cocaine, in violation of Title 21, United States Code, Sections 963 and 960(b)(1) (DE 252) (Gilberto Rodriguez-Orjuela Plea agreement). Rodriguez-Orejuela also agreed to enter a guilty plea to Count 1 of the indictment pending against him in the Southern District of New York (SDNY), Case No. 03-Cr-1465 (DE252:¶1).   Count 1 of the SDNY indictment charged Rodriguez-Orejuela with conspiracy to engage in money laundering, in violation of 18 U.S.C. §1956(h) (id.).

In the plea agreement, Rodriguez-Orejuela acknowledged that his sentence would be determined after the court considered the sentencing guidelines, that he faced a maximum term of life imprisonment, and that his advisory guideline range would be 360 months to life imprisonment (DE252:¶¶2, 4, 8(f)).   The United States and Rodriguez-Orejuela agreed that the imposition of a life sentence would violate the terms of the extradition order from Colombia and agreed to jointly recommend a sentence of 360 months' imprisonment in order to comply with the terms of the extradition order (DE252:¶¶4, 9).

2 We note that Colombia did not grant as to Count 4 on the ground that the comparable crime in Colombia does not carry a punishment of at least four years' imprisonment (DE196:n.3).

Rodriguez-Orejuela admitted that he had been part of a criminal conspiracy that imported into the United States and/or distributed in the United States more than 200,000 kilograms of cocaine worth at least two billion, one hundred million dollars ($2,100,000,000), and that he participated in the conspiracy after December 17, 1997 (DE252:¶13(a)).3  Rodriguez-Orejuela also agreed to forfeit $2,100,000,000 as well as certain assets listed in an attachment to the plea agreement (DE252:¶13(a)-(c)).

Rodriguez-Orejuela admitted that he had laundered substantial narcotics proceeds into several businesses, including Drogas La Rebaja, and agreed to their forfeiture (DE252:¶13(c)-(e)). Rodriguez-Orejuela and the government agreed that the government would recommend that Rodriguez-Orejuela receive credit for time served in a Colombian prison beginning on December 22, 2003, the date that the formal institution of the extradition request was served on him (DE252:¶14(a)).

Although Rodriguez-Orejuela agreed to plead guilty, he did not agree to cooperate in any government investigation or against any individual and acknowledged that he had "no expectation that he will receive any sort of future sentence reduction" (DE252:¶12).

**The Change of Plea**

During the change of plea hearing, the United States noted that:

> Your Honor, had this case against Defendants Miguel and Gilberto Rodriguez-Orejuela proceeded to trial, the Government would have proved beyond a reasonable doubt that these two Defendants were two of the founders and highest-ranking leaders of the cocaine-trafficking and money laundering organization commonly known as the Cali cartel.
>
> During the period covered by the indictment, that is, from 1990 through July 2002, these Defendants were responsible for the importation of over 200,000 kilograms of cocaine from Colombia into the United States.

---

3 In 1997, Colombia amended its constitution to provide for the extradition of its nationals, for offenses committed after December 17, 1997 (DE196:3)

Of those 200,000 kilos of cocaine, at least 100,000 kilograms were shipped by the Defendants here to the Southern District of Florida. During this same period, the Defendants and their co-conspirators made over $2.1 billion from their illegal cocaine trafficking.

The evidence presented at trial would have consisted of, among other things, the results of a consensual and court-authorized electronic surveillance, admissions made by the Defendants during Colombian judicial proceedings, photographs and physical evidence of cocaine seizures, accounting ledgers, prison logbooks, the testimony of fellow members of the cartel and other documentary evidence.

More specifically, the following are the cocaine shipping routes and cocaine-related events that the Government would have proved at trial beyond a reasonable doubt:

One: From 1990 to 1993, the Defendants operated cocaine-smuggling routes in which the cocaine was concealed in shipments of concrete posts, frozen vegetables, coffee and ceramic tile that traveled in cargo containers from Colombia through Venezuela, Panama or Guatemala to South Florida and elsewhere in the United States.

Records and testimony would have shown at trial that over 137,000 kilograms of cocaine were shipped in this manner, generating a total of over $1.3 billion for the Defendants and their criminal organization.

United States law enforcement seized a total of 24,500 kilograms of cocaine shipped in this manner by the Defendants. An additional 5,100 kilograms were seized by Panamanian law enforcement.

Two: From 1993 until late 1994 or 1995, the Defendants operated cocaine smuggling routes from which very large loads of cocaine were shipped via freighter or a cargo-converted 727 jet from Colombia to Mexico for transshipment to the United States.

Testimony would have shown at trial that more than 75,000 kilograms of cocaine were smuggled in this manner, generating approximately $800 million. Mexican law enforcement authorities working with US counterparts in Mexico seized a total of 17,500 kilograms of cocaine smuggled in this manner by the Defendants.

Although the Defendants were imprisoned in Colombia in 1995, they continued to run the operations of the Cali cartel from prison. The following are among the post-incarceration cocaine-shipping routes and cocaine-related events that the Government would have proved at trial beyond a reasonable doubt:

Three: In 1996 and 1997, the Defendants operated a cocaine-smuggling route in which the cocaine was concealed in shipments of empty chlorine gas cylinders or tanks being returned from Cucuta, Colombia, through Maracaibo, Venezuela, to Houston, Texas. In April 1997, a shipment was smuggled in this manner totaling 1,000 kilograms, which was seized by US law enforcement.

Four: In 1998, the Defendants caused to be smuggled and distributed within the United States two multi-hundred-kilogram loads of cocaine.

Five: In early 2000, the Defendants participated with co-conspirators in a plan to smuggle a load of 8,000 kilograms of cocaine through Mexico to the United States. This smuggling venture, however, was never realized.

Six: In March and April 2000, the Defendant Miguel Rodriguez-Orejuela financed a test shipment of cocaine through Colon, Panama, to the Port of Miami. This cocaine was placed in a container of pumpkins, and was to be removed surreptitiously by co-conspirators working in the port. Records and testimony at trial would have shown that this load consisted of 200 kilograms and was, at least in part, seized by law enforcement in the Port of Miami.

In addition to the foregoing, your Honor, the jury in this case at trial would have heard testimony regarding the smuggling of millions of dollars in United States currency from the United States back to Colombia beginning at least as early as 1990 and continuing at least through the year 1999.

The currency smuggling that occurred in 1997, 1998 and 1999 involved shipments of money that traveled from the United States through Panama and Venezuela to Colombia. This currency smuggling was conducted at the direction of the Defendants and furthered the cocaine-trafficking conspiracy.

(DE264:42-47).

Following this proffer, this Court inquired of Gilberto Rodriguez-Orejuela as to whether he "agree[d] with everything the prosecutor has stated about your involvement in this conspiracy," and the defendant responded "yes, your Honor." (DE264:47).

Gilberto Rodriguez-Orejuela waived the Pre-Sentence Investigation Report and proceeded directly to sentencing (DE264:63-64).   The court computed the defendant's offense level and the parties agreed it was a level 42, after a three-level reduction for acceptance of responsibility (DE264:64-66).   The corresponding advisory guideline range for level 42 and a Criminal History

Category of I was 360 months to life imprisonment (DE264:66).   The defendant and the United States had agreed to a thirty-year sentence and the court sentenced Gilberto Rodriguez-Orejuela to 30 years' imprisonment, a five-year term of supervised release, and a $100 special assessment (DE264:66-71).

Rodriguez-Orejuela is presently serving a 360-month sentence that began running on September 26, 2006 (Exh1:2).  His sentence was credited with 1,009 days of prior custody/jail credit from on December 22, 2003 until he was sentenced in September 2006 (Exh1:3).4  With the projected earning of good conduct time, he is anticipated to be released on February 9, 2030 (Exh1).5

**<u>Previous Motion for Sentence Reduction</u>**

On July 17, 2015, Rodriguez-Orejuela filed a <u>pro se</u> motion for sentence reduction (DE304). Rodriguez-Orejuela argued that Amendment 782 reduced the offense level applicable to his offense and urged the court to consider his advanced age, various medical problems and spotless prison disciplinary record (DE304:14).   The government filed a response in opposition (DE306).   The government argued that Amendment 782 had not changed Rodriguez-Orejuela's base offense level or his advisory guideline range of 360 months to life imprisonment, making him ineligible for a sentencing reduction (DE306:7).   Assuming arguendo that the court found Rodriguez-Orejuela eligible for a reduction, the government argued that the court should exercise

---

4 December 22, 2003 is the date that the formal institution of the extradition request was served on Rodriguez-Orejuela (DE252:¶14(a)). In the plea agreement, the parties agreed that the government would recommend that Rodriguez-Orejuela receive credit for time served in a Colombian prison beginning on December 22, 2003 and the BOP has given him credit for that time period (<u>id.</u>).

5 If the good conduct time is calculated according to the new standards contained in the FSA, his release date would be reduced by approximately 6 months to around September 7, 2029.

its discretion to deny a reduction (DE306:8).   The government pointed to the "almost unparalleled cocaine conspiracy" involved and the §3553(a) factors (DE306:8-10).

On October 16, 2015, the court issued an order denying the motion for sentence reduction for the reasons indicated in the government's response (DE307).   The court specifically noted that the defendant had agreed that he "was responsible for importing over 200,000 kilograms of cocaine making $2.1 billion during those twelve years" (DE307). The court further noted that both "Gilberto and Miguel Rodriguez-Orejuela were described as the founders and highest ranking leaders of the Cali Cartel.   Both defendants accepted that representation." (DE307:1-2).

### Present Motion for Compassionate Release

On October 22, 2019, the defendant, represented by counsel, filed a motion for compassionate release (DE310).   In the motion, the defendant asserted that the First Step Act allowed family and counsel to request compassionate release and this had been done "on September 4, 2019 in a letter to the warden at FCI Butner, and have had no response" (DE310:4).[6] The one-sentence letter is attached hereto as Exhibit 2. The letter did not set forth any basis for the request for compassionate release.

In his motion, Rodriguez-Orejuela states that he was "old and sick" (DE310).   He states that he was 80 years' old and as of October 22, 2019, with BOP good time, has served 245 months "or just over 68% of his sentence" (DE310). Rodriguez-Orejuela's motion sets forth a list of ailments, stating that he "may well be terminally ill," and arguing that he meets the compassionate

---

[6] Under 18 U.S.C. §3582(c)(1)(A), the motion may be made 30 days after a request made with Warden.   A court may consider a request for compassionate release "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier . . ."

release criteria of 18 U.S.C. §3582(c)(1)(A)(i) and Section 1B1.3 of the Sentencing Guidelines (DE310:2-3).7    Rodriguez-Orejuela states that he had "zero BOP infractions" and, in his present condition "could not be a plausible threat to anyone or anything" (DE310:4). Rodriguez-Orejuela states that his "release plan" was to live in Bogota, Colombia, with his wife and a daughter (DE310:4).8

On December 3, 2019, Rodriguez-Orejuela filed a Supplement to the Compassionate Release Motion, stating that he "has lost all vision in his left eye" (DE311).    Rodriguez-Orejuela further stated that it was not yet known if such loss would be "permanent or not" (id.).

The court ordered the government to respond no later than January 22, 2020 (DE312).

## LEGAL ANALYSIS

Under 18 U.S.C. §3582(c)(1)(A), a district court may reduce a term of imprisonment upon finding "extraordinary and compelling reasons," consistent with applicable policy statements of the Sentencing Commission. The pertinent policy statement, U.S.S.G. §1B1.13, defines specific medical, age, and family circumstances as possibly justifying a sentencing reduction under this statute, and further authorizes a sentencing reduction based on an extraordinary and compelling circumstance identified by Bureau of Prisons ("BOP").

---

7 Rodriguez-Orejuela also stated that he meets the BOP standards set in Program Statement 5050.49 for an Elderly Inmate with Medical Conditions. The BOP standards for Elderly Inmates with Medical Conditions are now set out in Program Statement 5050.50 (Attached hereto as Exhibit 3).

8 Rodriguez-Orejuela also complains that he "did not receive any credit from the Court or BOP for the nearly ten years he spent in prison in Colombia for the same set of offenses" (DE310:¶2). This court should note that Gilberto Rodriguez-Orejuela conducted criminal activities from the Colombian prison and pled guilty to a drug trafficking conspiracy that occurred during his time in prison in Colombia (DE21; (DE196:32) (Diplomatic Note No. 374). Accordingly, he should not now complain that he did not receive "credit" for the time spent in prison in Colombia.

In assessing the merits of a defendant's motion for compassionate release under Section 3582(c)(1)(A), the court's ultimate decision must be "consistent with applicable policy statements issued by the Sentencing Commission."   Further, 28 U.S.C. §994(t) provides:

> The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples.   Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason.

Accordingly, the policy statement of the Commission is binding on the court. See Dillon v. United States, 560 U.S. 817, 827 (2010) (where 18 U.S.C. §3582(c)(2) permits a sentencing reduction based on a retroactive guideline amendment, "if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," the Commission's pertinent policy statements are binding on the court).

The Commission's pertinent policy statement appears at U.S.S.G. §1B1.13.   As amended November 1, 2018, the statement repeats the text of Section 3582(c)(1)(A) and adds that the court should reduce the sentence only if the "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. §3142(g)."   The policy statement also encourages the Director of the BOP to file a motion for compassionate release if the defendant meets any of the circumstances set forth in Application Note 1.   U.S.S.G. §1B1.13 App. Note 4.   The same note further states: "The court is in a unique position to determine whether the circumstances warrant a reduction (and, if so, the amount of reduction), after considering the factors set forth in 18 U.S.C. §3553(a) and the criteria set forth in this policy statement, such as the defendant's medical condition, the defendant's family circumstances, and whether the defendant is a danger to the safety of any other person or to the community."

Application Note 1 sets forth the "extraordinary and compelling reasons" that may justify

compassionate release.   The note provides as follows:

1.   Extraordinary and Compelling Reasons.—Provided the defendant meets the requirements of subdivision (2) [regarding absence of danger to the community], extraordinary and compelling reasons exist under any of the circumstances set forth below:

(A)   Medical Condition of the Defendant.—

(i)   The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory).   A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required.   Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii)   The defendant is—

(I)   suffering from a serious physical or medical condition,

(II)   suffering from a serious functional or cognitive impairment, or

(III)   experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B)   Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C)   Family Circumstances.—

(i)   The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii)   The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D)   Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through

(C).

As noted above, the policy statement is not the only source of criteria the court may apply in determining whether "extraordinary and compelling reasons" exist to justify a reduction. Application Note 1(D) permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."   U.S.S.G. §1B1.13 app. note 1(D).   Accordingly, a court may grant compassionate release not only on grounds specified by the Sentencing Commission, but also those set forth in the relevant BOP regulation governing compassionate release.

That regulation appears at Program Statement 5050.50, available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf and is attached hereto as Exhibit 3.   This program statement was amended effective January 17, 2019, following passage of the First Step Act of 2018 and replaces the previous program statement, 5050.49.   Program Statement 5050.50 contains standards that are both more extensive than and slightly different from those stated in the Section 1B1.13 policy statement.   For instance, the program statement defines a "debilitated medical condition" as one where the inmate is "[c]ompletely disabled, meaning the inmate cannot carry on any self-care and is totally confined to a bed or chair; or [c]apable of only limited self-care and is confined to a bed or chair more than 50% of waking hours."   Program Statement 5050.50 at 5.   A terminal medical condition requires a diagnosis of a terminal, incurable disease and where the life-expectancy is 18 months or less "and/or has a disease or condition with an end-of-life trajectory under 18 USC 3582(d)(1)." Program Statement 5050.50 at 4.   The program statement's provisions regarding the class of elderly inmates eligible for compassionate release is also slightly different from the related provision in Section 1B1.13.

13

In order to grant relief, the Court must find "extraordinary and compelling reasons," that is, reasons that are exceptional, rare, and overpowering.   "[A] compassionate release due to a medical condition is an extraordinary and rare event."   White v. United States, 378 F.Supp.3d 784, 787 (W.D.Mo. May 9, 2019).   The defendant "bears the burden of establishing that compassionate release is warranted."   United States v. Heromin, 2019 WL 2411311, *2 (M.D.Fl. June 7, 2019) (citing United States v. Hamilton, 715 F.3d 328, 341 (11th Cir. 2013), in which the Eleventh Circuit noted that the defendant bears the burden of establishing his eligibility for a sentence reduction in a motion brought under Section 3582(c)(2)).   While the Defendant has chronic medical issues, he has not established that he is suffering from a "terminal illness" or that any of his medical issues "substantially diminish[]" his "ability . . . to provide self-care within the environment of a correctional facility and from which he . . . is not expected to recover."   U.S.S.G. §1B1.13 app. note 1(A).   Nor has he established that he "is experiencing a serious deterioration in physical or mental health because of the aging process." U.S.S.G. §1B1.13 app. note 1(B).   As such, the defendant has not established compelling and extraordinary reasons warranting compassionate release.   See Cannon v. United States, 2019 WL 5580233, *1-*3 (S.D. Ala. Oct. 29, 2019) (71-year-old inmate moved for compassionate release because he was suffering from "(1) severe and chronic back pain in his lower back which needs surgery, (2) severe and chronic pain in his upper chest and stomach area which cause him to bend forward when walking and results in a loss of stomach muscles and loss of other function in his upper and lower stomach area, (3) severe high blood pressure, (4) diabetes, (5) skin irritation, (6) loss of hearing which resulted in a hearing device being implanted, and (7) various heart, lung, and liver complications."   [The] Court denied the motion finding "[f]irst, there is no indication that Cannon is terminally ill. Second, despite the many medical afflictions Cannon identifies, he does not state, much less

provide evidence, that his conditions/impairments prevent him from providing self-care within his correctional facility. Rather, the medical records provided by Cannon show that his many conditions are being controlled with medication and there is no mention that his conditions are escalating or preventing him from being from being able to provide self-care."); United States v. Clark, 2019 WL 1052020, *1-*3 (W.D.N.C. Mar. 5, 2019) (denying motion for compassionate release based on inmate's "declining health, diabetes, stage-3 kidney failure, and back issues that require a walker" where "[e]ven if the Court assumes that [defendant] is suffering from a serious physical or medical condition or deteriorating physical health due to age, Defendant still falls short of the 'extraordinary and compelling' standard because she has not demonstrated that her condition substantially diminishes her ability to provide self-care within the corrections environment or that she is not expected to recover."); United States v. Malone, 2019 WL 3337906, *2 (W.D. Va. July 25, 2019) (denying compassionate release motion of a 68-year-old inmate suffering from "a series of ailments that have mostly stemmed from his colon-rectal cancer in the late 1990s and many issues stemming from the subsequent treatment."   "I do not doubt that Malone's imprisonment is made more severe by his condition, for which I have sympathy.   However, the federal prison system contains many inmates who have medical conditions that make confinement more difficult. I do not believe that the intent of the Sentencing Commission's Policy Statement is to reach all such inmates.").

## A.  Rodriguez-Orejuela Has Not Shown Extraordinary and Compelling Reasons

In this case, Rodriguez-Orejuela argues that he meets the BOP standards for an Elderly Inmate with Medical Conditions and the compassionate release criteria, i.e., that "extraordinary

and compelling reasons warrant a reduction (DE310:3).9 He states that he suffers from cancer, other ailments and from deteriorating physical health because of the aging process that "substantially decrease his ability to provide self-care within the environment of a correctional facility" (DE310:3).

Rodriguez-Orejuela's perfunctory letter to the BOP requested compassionate release under the First Step Act, but did not specifically request release as an Elderly Inmate with Medical Conditions.   The Program Statement, 5050.50 at page 6 provides the criteria for Elderly Inmates with Medical Conditions: (1) Age 65 or older; (2) suffer from chronic or serious medical conditions related to the aging process; (3) experience deteriorating mental or physical health that substantially diminishes their ability to function in a correctional facility; (4) conventional treatment promises no substantial improvement to their mental or physical condition; and (5) have served at least 50% of their sentence.   In Section 7 of Program Statement 5050.50 at page 12, the following factors are among those to be considered in evaluating a release request: (1) the nature and circumstances of the offense; (2) the length of the sentence and the amount of time served (3) the inmate's age at the time of the offense and sentencing; and (4) whether release would minimize the severity of the offense.

The BOP has considered the Rodriguez-Orejuela's request for compassionate release and has found that he has not presented any information that supports a finding of extraordinary and compelling reasons (Exh3). Rodriguez-Orejuela's health conditions do not qualify him for relief as they are not extraordinary and compelling and do not show that he is substantially diminished

---

9 The defendant states that he "may well be terminally ill" but does not claim that he has been diagnosed with a terminal, incurable disease and whose life expectancy if eighteen months or less, and/or has a condition with an end of life trajectory (DE310:3). In his supplement, Rodriguez-Orejuela also states that he has "lost all vision in his left eye" (DE311). Rodriguez-Orejuela does not yet know if that vision loss will be permanent (id.).

in his ability to provide self-care within the environment of a correctional facility and from which he is not expected to recover.    He clearly does not satisfy the criteria for compassionate release. Rodriguez-Orejuela is designated to FCI Butner Medium II located in Butner, N.C. See https://www.bop.gov/locations/institutions/btf/ .   FCI Butner Medium II is not a medical facility, but has medical staff onsite at all times and is part of the larger Federal Correctional Complex which includes a Federal Medical Center (FMC).

The BOP has given Rodriguez-Orejuela adequate medical care and, at the present time, there are no acute medical issues that require any special medical care that he is not receiving. At this time, the defendant is able to care for himself and complete his daily living activities. United States v. Burgos-Martinez, 97-cr-06007-FAM (S.D.Fl.) (DE 1404) (October 4, 2019) (in denying a request for compassionate release by a 78-year-old inmate who asserted that "his health has begun to fail" and that he "has required outside medical services on a half dozen occasions," the court noted that "it would appear from the record that Defendant does not have" "a terminal or serious health condition.").

 Rodriguez-Orejuela has not set shown any physical condition that qualifies either as a terminal illness or a combination of conditions that diminish his ability for self-care and from which he is not expected to recover.   Medical records show that Rodriguez-Orejuela is receiving care, as needed, including for his vision issues. Moreover, records show that Rodriguez-Orejuela is ambulatory, does not need a walker, and has reported no recent falls. The undersigned can provide the court with medical records, upon request. Further, Rodriguez-Orejuela has provided no medical history that shows he is substantially diminished in his ability to provide self-care while in confinement.  See United States v. Adams, 2019 WL 3751745, at *4 (M.D.N.C. August 8, 2019) ("Although Adams argues his medical condition makes it impossible for him to function in

17

custody, Dr. Abud's notes do not describe Adams' condition to be so debilitating and nothing in the record suggests that the Bureau of Prisons considers him incapable of functioning as an inmate. Instead, there is evidence that Adams successfully completed several courses as recently as August 2017."). Having failed to carry his burden of showing extraordinary and compelling reasons or a substantial diminishment in his ability to provide self-care, his motion should be denied.

**B.    Rodriguez-Orejuela Cannot Show That His Release Would Not Pose a Danger.**

Even assuming arguendo that Rodriguez-Orejuela has shown compelling reasons for his release, Section 3582(c)(1)(A)(i) permits release when consistent with any applicable policy statement of the Sentencing Commission. Under the policy statement which appears at USSG §1B1.13, a district court has no discretion to release a defendant unless it finds that the "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. §3142(g)." The policy statement is binding on the court.   Section 3142(g) is the portion of the pre-trial release statute dealing with, among other things, "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."   18 U.S.C. §3142(g)(4).

Rodriguez-Orejuela has presented no evidence that the danger to others no longer exists. Rodriguez-Orejuela was a co-founder and leader of the Cali Cartel, one of the largest cocaine trafficking organizations in history.   The overt acts listed in the superseding indictment alleged that the Cartel's operating methods included not only threats of violence, but the commission of violence (DE21:7-8).   For example, the superseding indictment alleged that on or about "August 21, 1997, Miguel Rodriguez-Orejuela and Gilberto Rodriguez-Orejuela ordered the killing of Empiro Diaz Castro, the manager of Petro Norte, a company in Cucuta, Colombia, S.A., that previously exported cocaine laden chlorine cylinders…"   In the affidavit submitted to support the

Rodriguez-Orejuelas' extradition, the agent stated that Cartel employees tortured and killed those suspected of being informants (DE33:96).

Rodriguez-Orejuela entered a guilty plea in this case and admitted to having been a founder and leader of the Cali Cartel.   By way of background on the Cartel, the government cites to other cases involving members of the Cartel.   For example in Case No 91-00115-Roettger, the indictment alleged that Rodriguez-Orejuela, during a phone call, threatened to kill DEA Special Agent James Shedd, who was acting in an undercover capacity, if money was not repaid (Case No. 91-00115-PAS; DE1:21:¶106).   During a trial of other Cartel employees, in Case No. 93-470-Cr-Hoeveler, Agent Shedd testified about that phone call with Rodriguez-Orejuela (July 1, 1997 at Vol. 25 at pp. 3839-45) ("but be very clear that all of those sons of bitches who don't want to pay us, we are going to kill them").[10]

During a trial in Case No. 93-470-Cr-Hoeveler, there was ample testimony regarding the Cartel's use of violence. For example, Guillermo Pallomari, the Cartel's accountant, testified that the Cartel had employees, Guillermo "Memo" Lara Restrepo and Andres Velez, who carried out killings for the Cartel (July 17, 1997 at Vol.36:5852-54; July 21, 1997 at Vol. 37:6060-61; July 23, 1997 at Vol. 39:6274).   Pallomari testified that his wife was kidnapped as a result of his not complying with the Cartel's demands (July 28, 1997 at Vol. 40:6476-82) ("He left a message that my wife had been kidnapped because she had not – because orders of Miguel Rodriguez-Orejuela had not been obeyed"). Pallomari testified that he never heard from his wife thereafter (July 28, 1997 at Vol. 40:6493) ("I never again spoke to her, nor did I ever see her again").   Additionally, in connection with Case No. 93-470-Cr-Hoeveler, there were witnesses who were provided with government protection due to the Cartel's violent propensity towards those who cooperated against

---

10 Excerpts of the testimony herein are attached hereto as Composite Exhibit 5.

it.

Finally, releasing Rodriguez-Orejuela early jeopardizes public safety by diminishing the seriousness of his offense and would send entirely the wrong message about leading such a large-scale drug trafficking and the punishment that must come with it.

**C.   The §3553(a) Factors Do Not Support Rodriguez-Orejuela's Early Release.**

Even if the Court were to find that Rodriguez-Orejula is not a danger to the safety of any other person or to the community, the §3553(a) factors – which this Court must consider also – in their totality weigh against his release.   First, the nature and circumstances of Rodriguez-Orejuela's offense remains just as serious today as they did at the time of sentencing.   The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense (18 U.S.C. §§3553(a)(2)(A)-(C)) similarly still support Rodriguez-Orejuela's incarceration.   The charge on which he was convicted, conspiracy to import five kilograms or more of cocaine, is serious. The other §3553 factors further cut against releasing Rodriguez-Orejuela early.   Although a court may consider the need for the sentence imposed to provide the defendant with needed … medical care," 18 U.S.C. §3553(a)(2)(D), there is no claim that BOP has failed to provide the needed medical care. Rodriguez-Orejuela's guidelines range was 360 months to life and the guidelines generally can be assumed to be a rough approximation of a sentence that would achieve §3553(a)'s objectives.   Rita v. United States   551 U.S. 338, 350 (2007).

It is important to note that Rodriguez-Orejuela's guideline range was 360 months to life, but that the parties agreed that the sentence was limited by the extradition order to 360 months' imprisonment (DE264:13-14, 66-71). The court agreed that the extradition order should be complied with and limited its sentencing options to a thirty-year sentence (DE264:15, 70).

Rodriguez-Orejuela's sentence would likely have been longer without the limitation imposed in the extradition order and his 360-month sentence should not now be reduced.

WHEREFORE, the Government respectfully requests that this Court deny the defendant's motion for compassionate release.

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

By:    */s/Lisa Hirsch*
Lisa Hirsch
Assistant United States Attorney
FL Bar No. 0691186
99 N.E. 4th Street, Suite 500
Miami, FL 33132
Tel# (305) 961-9214
Fax: (305) 536-7214
Lisa.Hirsch@usdoj.gov

By:    */s/Lynn M. Kirkpatrick*
Lynn M. Kirkpatrick
Assistant United States Attorney
Court No. A5500737
99 N.E. 4th Street, Suite 400
Miami, FL 33132
Tel# (305) 961-9239
Lynn.Kirkpatrick@usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on January 21, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

*/s/Lynn M. Kirkpatrick*
Lynn M. Kirkpatrick
Assistant United States Attorney