UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number: 03-CR-20774-MORENO**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

GILBERTO RODRIGUEZ-OREJUELA,

        Defendant.

_____/

## ORDER DENYING DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE

THIS CAUSE came before the Court upon defendant Gilberto Rodriguez-Orejuela's

Motion for Compassionate Release. The Court has considered the motion, the response, and the

reply, as well as the various other related motions, responses, and replies on record. The Court

has also considered the multiple notices of supplemental authorities filed by Rodriguez-Orejuela,

and oral argument presented by counsel at a status hearing on February 5, 2020. Being otherwise

fully advised in the premises, it is **ADJUDGED** that for the reasons below, the motion is **DENIED**.

### I. BACKGROUND

#### A. Gilberto Rodriguez-Orejuela and the Cali Cartel

Gilberto Rodriguez-Orejuela is no ordinary defendant. Nicknamed "El Ajedrecista" ("the

Chess Player"), he was the infamous co-founder and co-leader with his brother, Miguel, of one of

the world's largest criminal organizations in the 1980s and 1990s: the Cali Cartel. Founded in its

namesake city of Cali, Colombia, the Cali Cartel imported into the United States at least 200,000

kilograms of cocaine (approximately eighty percent of the country's supply at that time) worth

billions of dollars. Once compared by the Drug Enforcement Agency to the Komitet

Gosudarstvennoy Bezopasnosti ("KGB") due to its vast intelligence and surveillance networks spanning the globe, the Cali Cartel was estimated, at the height of its operations, of controlling over ninety percent of the world's cocaine market. By the mid-1990s, Rodriguez-Orejuela and "Los Caballeros de Cali" ("the Gentlemen of Cali") had formed a drug trafficking empire worth billions of dollars, with annual revenue comparable to a Fortune 500 company.

As Rodriguez-Orejuela agreed to at his change of plea hearing held more than a decade ago, the Cali Cartel attained such revenue by employing creative smuggling techniques. From 1990 to 1993, for instance, the Rodriguez-Orejuela brothers and the cartel operated smuggling routes in which cocaine was concealed in "concrete posts, frozen vegetables, coffee, and ceramic tile" that would travel in cargo containers from Colombia through Venezuela, Panama or Guatemala to South Florida and elsewhere in the United States. Evidence at trial would have shown that "over 137,000 kilograms of cocaine were shipped in this manner, generating a total of over $1.3 billion for the Defendants and their criminal organization." Then, from 1993 until late 1994 or 1995, the brothers and cartel operated smuggling routes from which "very large" loads of cocaine were shipped by freighter ships or Boeing 727 jet from Colombia to Mexico for transshipment to the United States. Evidence would have shown that "more than 75,000 kilograms of cocaine were smuggled in this manner, generating approximately $800 million."

For these crimes and more, the Rodriguez-Orejuela brothers were named in a number of indictments across the United States. In March of 1987, the brothers were indicted in the United States District Court for the Eastern District of Louisiana on various drug charges related to the importation of hundreds of pounds of cocaine (case number 2:87-cr-00346-WBV-DMD). In 1991, Rodriguez-Orejuela and others were indicted on money laundering conspiracy charges in the Southern District of Florida (case number 91-0115-cr-Roettger). Four years later, the Rodriguez-

Orejuela brothers, along with many other members of the Cali Cartel, were indicted in the Southern District of Florida for various drug offenses and more money laundering offenses (case number 93-cr-00470-WMH). In total, one-hundred cartel members were successfully prosecuted in the United States and Colombia, with seventy-five successfully prosecuted in the United States pursuant to Operation Cornerstone—a multi-year investigation led by the U.S. Immigration and Customs Enforcement with assistance from the Drug Enforcement Administration.

But the Rodriguez-Orejuela brothers were not among those tried in the United States during the 1990's, and for years they evaded capture by authorities. As recounted by the United States Court of Appeals for the Eleventh Circuit in a case dealing with the prosecution of attorneys formerly employed by the Cali Cartel, the brothers were initially successful in avoiding prosecution and extradition. *United States v. Abbell*, 271 F.3d 1286, 1291 (11th Cir. 2001). They achieved this success by enforcing a strict code of silence that would become a defining characteristic of the cartel, paying the legal fees of any captured members in order to hinder their cooperation with authorities. When those members were still willing to talk, the brothers would then threaten them or their families with violence. "Employees were told not to cooperate with authorities if employees were ever arrested. To maintain this code of silence the Cartel utilized a carrot-and-stick approach. On the one hand, the Cartel paid the attorney's fees of members and expenses for those members' families and, on the other hand, threatened those employees who were arrested and their families with injury or death if they cooperated with authorities." *Id.*

After eluding capture for years, the Rodriguez-Orejuela brothers were finally apprehended in 1995: Gilberto in June, Miguel in August. But any hope that the capture of the leaders of the Cali Cartel would stifle the flow of cocaine into the United States was quickly erased when, as Rodriguez-Orejuela agreed to at the change of plea hearing, the brothers continued to run the cartel

from La Picota prison in Bogota, Colombia. In 1996 and 1997, the brothers oversaw a smuggling operation in which the cartel concealed cocaine in shipments of "empty chlorine gas cylinders or tanks" that travelled from Cucuta, Colombia, through Maracaibo, Venezuela, and then to Houston, Texas. United States law enforcement would seize "1,000 kilograms" of cocaine shipped in this manner upon arrival in Houston. In 1998, the brothers then oversaw the smuggling and distribution within the United States of "two multi-hundred-kilogram loads of cocaine." Finally, in early 2000, the brothers and others planned to smuggle "a load of 8,000 kilograms of cocaine" that would travel through Mexico to the United States. This smuggling venture, however, was never realized.

All the while, the brothers continued to enforce their code of silence. The extradition package in this case contains evidence that, in one instance, they ordered the kidnapping and murder of Gladys Patricia Cardona Caceres, the wife of Guillermo Pallomari, as well as another person. Upon deciding to serve as a witness, Pallomari, once the head accountant of the Cali Cartel, would never see his wife again. In a letter to this Court, he recounts that "Gilberto Rodriguez and Miguel Rodriguez gave the order for my wife Patricia Cardona and my best friend Fredy Vivas [to] be kidnapped and brutally murdered by hitmen of the drug trafficker 'Pacho' Herrera (Leader of the Cali Cartel)[.] I had always had a suspicion that Patricia, my wife before killed she was cruelly tortured and raped by Pacho Herrera's hitmen."

### B. Extradition and Conviction in the United States

The Rodriguez-Orejuela brothers' crimes in prison eventually led to their demise and extradition to the United States. On January 22, 2004, a federal grand jury sitting in the Southern District of Florida returned a four-count count superseding indictment charging them and other members of the Cali Cartel. Specifically, the defendants were charged with conspiracy to import five kilograms or more of cocaine into the United States (count one); conspiracy to possess with

the intent to distribute five kilograms or more of cocaine (count two); conspiracy to money launder (count three); and conspiracy to commit offenses against the United States, that is, to corruptly and by threats and force, influence, obstruct, and impede the administration of justice, to kill other persons with the intent to prevent the attendance and testimony of any person in official proceedings, and to kill other persons with the intent to prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission and possible commission of a federal offense (count four). The overt acts listed in count four included ordering the murders of several persons, including the wife of Pallomari.

On September 26, 2006, pursuant to a plea agreement, Rodriguez-Orejuela entered a guilty plea to count one of the superseding indictment, which charged him with conspiracy to import five kilograms or more of cocaine. He admitted in the plea agreement that "since 1990 he was a part of a criminal conspiracy that imported into the United States and/or distributed in the United States more than 200,000 kilograms of cocaine worth at least two billion, one hundred million dollars ($2,100,000,000), and that he participated in such criminal conspiracy after December 17, 1997." He also agreed "to forfeit all of his right, title and interest in two billion, one hundred million dollars ($2,100,000,000) worth of assets." When the United States read the factual proffer out loud at his change of plea hearing, he agreed that he and his brother were responsible for all of the drug smuggling activities recounted above from 1990 to 2000. He also agreed that they had smuggled millions of dollars from the United States to Colombia between those years.

At sentencing, held the same day as the change of plea, both parties recommended a sentence of 360 months' imprisonment in order to comply with an extradition order from Colombia. The applicable advisory guideline range for count one was 360 months to life imprisonment. The Court honored the parties' request and extradition order, and subsequently

5

imposed a term of 360 months' imprisonment followed by five years of supervised release. The Court also credited Rodriguez-Orejuela with 1,009 days of prior custody/jail credit for time served in Colombia from December 22, 2003 until the date of sentencing. Currently, Rodriguez-Orejuela is incarcerated in Federal Correctional Institute ("FCI") Butner Medium II located in Butner, North Carolina. His release date, taking into account his projected good time credit, is February 9, 2030. Rodriguez-Orejuela is eighty-one years old and states that his life expectancy is eight years.

### C. The Present Motion for Compassionate Release

Thirteen years after sentencing, Rodriguez-Orejuela now files a motion for compassionate release, arguing that due to his advanced age and poor health, as well as the current COVID-19 pandemic sweeping the nation, he is entitled to early release. He recounts that before filing the present motion, his counsel requested compassionate release on his behalf in a letter addressed to the warden of FCI Butner II. In that letter, which is only a sentence long, his counsel wrote: "Please accept this letter as a request for compassionate release under the First Step Act for Gilberto Rodriguez-Orejuela, by me as his counsel." The warden eventually rejected the letter for various reasons, explaining first that contrary to Bureau of Prisons ("BOP") Program Statement 5050.50, no basis was given detailing the extraordinary circumstances for seeking compassionate release. The warden then explained that even if a basis had been given, Rodriguez-Orejuela does "not meet the criteria for compassionate release under any criteria (i.e., terminal medical condition, debilitated medical condition, elderly inmate with medical condition, or other elderly inmates)."

Rodriguez-Orejuela effectively appeals the warden's determination in his motion for compassionate release. He submits a lengthy list of medical ailments he is suffering from, and argues he cannot take care of himself. He contends that a reduced sentence of 225 months, or time served, under the circumstances of the case meets the criteria of 18 U.S.C. § 3553(a). He has been

6

in custody since December 22, 2003, "and served more than nine years in Colombia for the same offense to which he entered a plea here." If released, Rodriguez-Orejuela notes that he would move to Cali, Colombia. There, he and his wife will have the close personal and financial support of their children, nieces, nephews, and cousins. The family is "eager to help Gilbert Rodriguez-Orejuela get settled in a small apartment they will rent for him in Cali, where he will live a somewhat austere but dignified and decent life. . . . All of his health care needs will be well met."

## II. ANALYSIS

### A. The Compassionate Release Framework

Rodriguez-Orejuela moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A), which was amended by the First Step Act to allow defendants, like Rodriguez-Orejuela, to petition a court after first exhausting their administrative remedies with the BOP.[1] Generally, once a term of imprisonment has been imposed, a court may not modify it. *United States v. Moreno*, 421 F.3d 1217, 1219 (11th Cir. 2005). However, under section 3582(c)(1)(A) (titled "Modification of an imposed term of imprisonment"), a court may reduce a term of imprisonment upon finding "extraordinary and compelling reasons," that are "consistent with applicable policy statements issued by the [United States] Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). The statute also requires a court "to consider the factors set forth in [18 U.S.C. §] 3553(a) to the extent they are applicable." *Id.* Those factors include, among other things, "(1) the nature and circumstances of the offense and the history and characteristics of the defendant," as well as "(2) the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law,

---

[1] While an argument can certainly be made in this case that Rodriguez-Orejuela fails to exhaust his administrative remedies before filing the present motion, the Court finds that, because the warden at FCI Butner II did expressly consider his medical condition as a possible basis for relief, Rodriguez-Orejuela has sufficiently preserved his argument with respect to that specific basis for release. As detailed later, the same cannot be said for his request for compassionate release due to the COVID-19 pandemic.

and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a).

The relevant policy statement issued by the Sentencing Commission is found in U.S.S.G. § 1B1.13.[2] It provides that a court may reduce a term of imprisonment if "(1)(A) extraordinary and compelling reasons warrant the reduction;" "(2) the defendant is not a danger to the safety of any other person or to the community;" and "(3) the reduction is consistent with this policy statement." U.S.S.G. § 1B1.13. The policy statement then explains in its commentary that extraordinary and compelling reasons can mean one of three things. Relevant here, the first is the medical condition of the defendant, which enables eligibility for a reduction if the defendant is "suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory)." *Id.* § 1B1.13 Application Note 1(A)(i). Or the defendant may be "suffering from a serious physical or medical condition" or "experiencing deteriorating physical or mental health because of the aging process," either of which "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." *Id.* § 1B1.13 Application Note 1(A)(ii). Besides the medical condition of the defendant, there is a second type of relief based on age. This allows a sentencing reduction if the defendant "(i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less." *Id.* § 1B1.13 Application Note 1(B).

The policy statement is not the only source of criteria that a court may use in determining whether extraordinary and compelling reasons exist to justify a sentencing reduction. The

---

[2] The Sentencing Commission is authorized by statute to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t).

commentary to the statement also permits a reduction where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 Application Note 1(D).  According to a program statement issued by the BOP, an inmate may be considered for a reduced sentence if he or she has "an incurable, progressive illness," or has "suffered a debilitating injury from which [he or she] will not recover," or is "[c]ompletely disabled, meaning the inmate cannot carry on any self-care and is totally confined to a bed or chair," or "[c]apable of only limited self-care to a bed or chair more than 50% of waking hours." BOP Program Statement 5050.50, at 5.  The program statement also allows elderly inmates to seek release, provided they meet the following criteria: "[a]ge 65 and older," "[s]uffer from chronic or serious medical conditions related to the aging process," "[e]xperiencing deteriorating or physical health that substantially diminishes their ability to function in a correctional facility," "[c]onventional treatment promises no substantial improvement to their mental or physical condition," and "[h]ave served at least 50% of their sentence." *Id.* at 6.

### B. Rodriguez-Orejuela Fails to Satisfy His Burden of Proving Extraordinary and Compelling Reasons Exist to Justify His Early Release

In his motion, Rodriguez-Orejuela concedes from the start that he is not terminally ill, but emphasizes he is an "old, beaten, and very sick man."  He "seek[s] compassionate release now under the Elderly Inmate with Medical Conditions standard."  He writes that he is suffering from a "lengthy laundry list" of problems, including: metastatic colon cancer (requiring the removal "of 25 cm of his intestine and the installation of a stomatic colostomy bag"), metastatic prostate cancer, chronic gastrointestinal disorder, chronic stricture and stenosis of esophagus, Barrett's esophagus, chronic diaphranatic hernia, two heart attacks (the latter requiring a pacemaker), chronic coronary

artery disease, chronic hypertension, chronic dysphagia, chronic anxiety and depression, hyperlipemia, gout, hyperplasia, acute chronic sinusitis, acute periodontitis, psoriasis, and skin cancer. He adds in a supplemental motion that since the date of filing his motion for compassionate release, he has been hospitalized for an endoscopy and has had other procedures to relieve the obstruction and pressure caused by his Barrett's esophagus. He has also lost all vision in his left eye and has had to see a cardiologist for his high blood pressure and cardiac arrhythmia.

This list, Rodriguez-Orejuela argues, demonstrates he is suffering a serious physical or medical condition, and a serious deterioration in physical health due to the aging process that substantially diminishes his ability to provide self-care. On this last point, Rodriguez-Orejuela submits various letters by inmates who were, at one point or another, his cell mates. They paint a picture of a frail and often-tired man whose days are "greatly numbered." He "goes to the hospital (FMC) 3 to 4 [times] a month" and when on the way, "has to sit in a wheelchair." He "often and easily gets exhausted and so he must use a walker to walk," "gets up about 8 to 10 times just to use the bathroom" at night, "can't bend down to pick stuff up or move things" and "gets tired fast." One inmate goes so far as to opine that "I believe that for him to make his chronic conditions bearable, in respect to him being an elder person with several chronic conditions, ethically and morally he needs a healthier environment outside of prison."

The United States contests the motion. It argues that while Rodriguez-Orejuela does have several medical conditions, he still does not have one serious enough to merit release, and he can still take care of himself. The United States relies on a declaration by Dr. Sara Beyer, who is currently the Complex Clinical Director at the Federal Correctional Complex in Butner responsible for overseeing all healthcare at the institution. After reviewing Rodriguez-Orejuela's medical records, she reports that his cancers have been treated, that there is no evidence of Barrett's

esophagus, that his vision in his left eye is returning, and that his many heart conditions are stable. She notes that he can also take care of himself, and can move using a rolling walker.

After carefully reviewing the relevant medical records, the Court finds that, although the records are extensive, Rodriguez-Orejuela is not suffering from the kind of physical or medical condition required by statute to merit a reduction in sentence. In order to grant the requested relief, the Court must find the existence of "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A). "[A] compassionate release due to a medical condition is an extraordinary and rare event." *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019). In seeking a reduced sentence under this framework, the defendant "bears the burden of establishing that compassionate release is warranted." *United States v. Heromin*, No. 8:11-cr-550-T-33SPF, 2019 WL 2411311, at *2 (M.D. Fla. June 7, 2019) (citing *United States v. Hamilton*, 715 F.3d 328, 341 (11th Cir. 2013)). Even if a defendant meets that burden, "the district court still retains the discretion to determine whether a sentence reduction is warranted." *Hamilton*, 715 F.3d at 341.

While the Court does not doubt that many of Rodriguez-Orejuela's ailments impose significant hardship, the standard for a sentencing reduction requires something more: a "chronic or serious medical condition" and "deteriorating mental or physical health that substantially diminishes his ability to function in a correctional facility."[3] BOP Program Statement 5050.50, at 6. It also requires evidence that conventional treatment is not able to substantially improve the health of the defendant. *Id.* Relying on the declaration of Dr. Beyer, the only doctor in this case

---

[3] The Court notes that in analyzing the motion for compassionate release, it is applying the criteria for elderly inmates with medical conditions seeking release under BOP Program Statement 5050.50—the same criteria Rodriguez-Orejuela argues applies in this case. Perhaps, he looks to these factors as they appear to require the existence of a "chronic" medical condition rather than a "serious" one. But that is no matter. Extraordinary and compelling reasons, the standard the Court must still apply pursuant to section 3582(c)(1)(A), would require that any chronic condition be, in fact, a serious one. Furthermore, the other requirements of the program statement suggest too that any chronic condition be serious in nature.

to provide a medical opinion, the Court finds that Rodriguez-Orejuela fails to carry his burden as to all three requirements. Dr. Beyer explains that all of Rodriguez-Orejuela's ailments have stabilized or subsided, to the point where any risk of death is not immediate or foreseeable and that he is still able to provide meaningful self-care in prison. With regards to colon cancer, perhaps the most severe condition the defendant complains of, the doctor notes "he has had no recurrence of the cancer for more than ten years." As for prostate cancer, another severe condition, she writes "he has had no recurrence of the prostate cancer since he completed treatment in 2011."

Dr. Beyer's opinions on the rest of Rodriguez-Orejuela's medical conditions are essentially the same—for Barrett's esophagus: "the gastroenterologist who evaluated him in December 2019 found no evidence of the condition"; for the loss of vision in his left eye: his vision is "much improved" after visiting an ophthalmologist; and for his coronary artery disease: Dr. Beyer reports that "his condition is stable, and is being managed with appropriate medication." With regards to Rodriguez-Orejuela's various other heart issues, Dr. Beyer details that after Rodriguez-Orejuela wore a heart monitor in February 2020, doctors found "no evidence of ventricular tachycardia, AV block, atrial fibrillation, or any other issues of concern." Additionally, she states, the pacemaker implanted after his most recent heart attack is working properly. As for his high blood pressure, "the plan is to have him meet with the Cardiologist to discuss other options" after the medication he had been recently taking, Amlodipine, was having negative side effects. Finally, in early February 2020, Rodriguez-Orejuela visited his dermatologist given his history of basal cell epithelioma ("BCE"), actinic keratosis, and squamous cell carcinoma on his left forearm. "The Dermatologist noted no evidence of new or recurrent BCE or squamous cell carcinoma." While actinic keratosis was found, "the noted areas were treated" and he will have a follow-up soon.

In short, the Court is sufficiently convinced after reading Dr. Beyer's declaration, as well

as the submitted medical records, that Rodriguez-Orejuela's medical condition, while far from perfect, is also far from extraordinary and compelling. Thanks to the treatment he has received from his primary care provider and team of specialists, which includes visits with an array of doctors, his condition is stable. The testimonials Rodriguez-Orejuela submits on behalf of various inmates serve only to confirm the Court's finding. None of the inmates identify a pressing medical need—certainly nothing indicating that his medical condition is terminal or serious at present. And while they do report that Rodriguez-Orejuela is constantly short of breath and fatigued, and has difficulty moving without a walker and sometimes wheelchair, the fact remains that Rodriguez-Orejuela can still move without assistance from others, albeit with difficulty. Dr. Beyer notes, too, that he can still function and provide sufficient self-care in his daily activities.

Based on the above, Rodriguez-Orejuela fails to carry his burden for proving he merits compassionate release. *See Klatch v. United States*, No. 8:17-cr-135-T-27JSS, 2020 WL 1694299, at *2 (M.D. Fla. Apr. 7, 2020) (denying compassionate release based, in part, on the defendant failing to "provide any medical documentation in support of his assertions" that he is suffering a serious medical condition due to "the denial of his access to psychotherapy and medicine for his asserted addiction"); *United States v. Weidenhamer*, No. CR-16-01072-001-PHX-ROS, 2019 WL 6050264, at *5 (D. Ariz. Nov. 8, 2019) (denying compassionate release and noting "[c]hronic conditions that can be managed in prison are not a sufficient basis for compassionate release."); *Cannon v. United States*, No. CR-11-048-CG-M, 2019 WL 5580233, at *3 (S.D. Ala. Oct. 29, 2019) (denying compassionate release because "despite the many medical afflictions [the defendant] identifies, he does not state, much less provide evidence, that his conditions/impairments prevent him from providing self-care within his correctional facility. Rather, the medical records provided . . . show that his many conditions are being controlled with

medication and there is no mention that his conditions are escalating or preventing him from being from being able to provide self-care."); *United States v. Dowlings*, No. CR413-171, 2019 WL 4803280, at *1 (S.D. Ga. Sept. 30, 2019) (denying compassionate release where the defendant asserted he was diagnosed with a brain tumor, but did not "indicate that he [wa]s unable to care for himself while incarcerated"); *Heromin*, 2019 WL 2411311, at *2 ("The Sentencing Guidelines state that 'extraordinary and compelling reasons' require not only a serious medical condition, but also the inability of the defendant to 'provide self-care' within the correctional facility. Without his medical provider corroborating either of these requirements, [the defendant] has not shown a foundation for compassionate release . . . ." (citation omitted)).

### C. Regardless of Whether Rodriguez-Orejuela Satisfies His Burden, He Does Not Merit Compassionate Release Under the Section 3553(a) Sentencing Factors

While seeking compassionate release based on his medical condition and age, Rodriguez-Orejuela also argues he is no longer dangerous and deserves release upon reapplication of the section 3553(a) sentencing factors. The United States counters his side argument and directs the Court's attention to the nature and scope of his crime. Additionally, it argues that "denying Rodriguez-Orejuela's motion will uphold the public's faith in our system of justice and send the message that after a just conviction and a sentence appropriate to the crime, the leader of one of history's largest drug cartels cannot escape the full consequences of his criminal conduct." In response, Rodriguez-Orejuela argues that the United States' fears are overblown. He urges the Court to consider only the crime he pled guilty to, a non-violent offense, as well as his old age and frail health. He remarks that based on his age and health, "[h]e is truly as dangerous as he looks." Plus, he writes, he has spent the last few decades in prison, and the Cali Cartel is "long gone."

Turning to the sentencing factors, the Court's analysis is virtually unchanged from thirteen years ago. Rodriguez-Orejuela was originally sentenced to thirty years in prison due to the grave

and heinous nature of his charged crime, and the purposes behind that sentence remain fully intact today as they were then.   Even if Rodriguez-Orejuela does demonstrate extraordinary and compelling medical reasons meriting release (he does not), a "court is not required to reduce a sentence on compassionate release grounds, even if a prisoner qualifies for such reduction because of his medical condition. . . . [Section 3582] was drafted using the word 'may,' not 'must.'" *United States v. Israel*, No. 05 CR 1039 (CM), 2019 WL 6702522, at *11 (S.D.N.Y. Dec. 9, 2019).

The Court cannot ignore, as the United States argues, Rodriguez-Orejuela's offenses. Rodriguez-Orejuela points out that he pled guilty to only conspiracy to import five kilograms or more of cocaine.   But the "the nature and circumstances of the offense, and history and characteristics of the defendant" tell the complete story.  18 U.S.C. § 3553(a).  As he agreed to in his factual proffer, Rodriguez-Orejuela and his brother were co-leaders of a criminal conspiracy that imported into the United States more than 200,000 kilograms of cocaine worth at least $2,100,000,000.  These facts cannot be emphasized enough, and together, merit the immediate denial of his motion for compassionate release regardless of medical condition.  The Court can only imagine the far-reaching, destructive effects of this much cocaine in the United States.  How many thousands, if not hundreds of thousands, of lives were affected?  In addition, the Court readily finds that reducing Rodriguez-Orejuela's sentence would diminish public respect for the law, sending a message to the public and worse, all would-be criminals, that even the head of a multibillion-dollar drug empire can obtain release after serving less than twenty years in prison. The Court is totally unwilling to undermine and undo such public respect for the law, as well as the gravity of the offenses committed, and the unyielding courage and tireless dedication of all United States law enforcement personnel involved in the front lines of Operation Cornerstone.

The Court also denies the motion "to protect the public from further crimes of the

defendant." 18 U.S.C. § 3553(a).  While, at eighty-one years old, Rodriguez-Orejuela is "not as dangerous as he looks," he still retains the ability to command others to commit crimes on his behalf—which, notably, is the very same ability he used time and again *from a Colombian prison cell* to direct the importation of vast amounts of cocaine into the United States, as well as possible murders.  Pallomari, the former accountant of the Cali Cartel, submits a letter to this Court which serves as a grim and sobering reminder of Rodriguez-Orejuela's cunning abilities.  In it, he begs the Court to deny Rodriguez-Orejuela's motion, and recounts that his wife and best friend were murdered at the direction of the Rodriguez-Orejuela brothers (in an attempt, no doubt, to enforce the cartel's code of silence).  He writes that "Gilberto Rodriguez, from the moment I met him on the Cali Cartel . . . was always a man with quick decisions to solve his problems by sending his hitmen to murder their enemies or opponents regardless of whether their relatives accompanied them."  With this letter in mind, the fact that Rodriguez-Orejuela also seeks to return to Cali upon his release—the seat of his former drug-trafficking empire—gives the Court even greater pause.

Accordingly, based upon application of the section 3553(a) sentencing factors, only one conclusion is merited in this case: denial of the motion for compassionate release.  *See United States v. Gotti*, No. 02 CR 743-07 (CM), 2020 WL 497987, at *6 (S.D.N.Y. Jan. 15, 2020) (denying compassionate release because "[t]he danger posed by a Gambino Family leader like Gotti is not that he will personally engage in acts of violence, but that he can command others to do so.").

### D. The Threat of the COVID-19 Pandemic Does Not Alter the Court's Holding

As an additional ground for compassionate release, Rodriguez-Orejuela cites the COVID-19 pandemic.  He writes that according to the BOP's website, as of April 12, "Butner Medium has 45 inmates and 22 staff that have tested positive, for a total of 67 confirmed positives (which is most in the country)."  Being especially at risk given his advanced age and health problems,

16

Rodriguez-Orejuela then relies on an April 3, 2020 memorandum by Attorney General William Barr. In that memo, Attorney General Barr urges the BOP to transfer all at-risk inmates to home confinement wherever appropriate to decrease the risks of the virus to their health. The United States, unsurprisingly, also opposes this new ground for release, rejecting the notion that the facility where Rodriguez-Orejuela is housed is not safe, and arguing again that regardless of whether Rodriguez-Orejuela is susceptible to the virus, he still does not merit early release.

The Court again agrees with the United States. The COVID-19 outbreak at FCI Butner, while real, does not move the pendulum any closer towards compassionate release. Looking to the same BOP website Rodriguez-Orejuela cites, as of the date of writing this Order, FCI Butner Medium II (where Rodriguez-Orejuela is specifically incarcerated) has no confirmed cases of COVID-19. Moreover, the same April 3 memo that Rodriguez-Orejuela relies on to argue release actually serves to defeat his present motion. That memo (by expressly requiring the consideration of factors established in a prior March 26 memo by Attorney General Barr) makes clear that while the BOP is authorized to release certain inmates, protecting the public remains a paramount consideration. Thus, for the same reasons above—that Rodriguez-Orejuela was the leader of one of the world's largest drug cartels who directed others to commit his crimes—the Court denies the motion based on the COVID-19 threat. While the April 3 memo does prioritize the use of home confinement as a tool for combatting COVID-19, it is "not a get-out-of-jail-free card for every incarcerated person." *United States v. Esformes*, No. 16-20549-CR-Scola (S.D. Fla. Apr. 9, 2020).

The above analysis, however, is unnecessary. Rodriguez-Orejuela's instant motion for compassionate release is not ripe for review. The statute at play first requires that before bringing the present motion based on COVID-19, Rodriguez Orejuela "fully exhauste[] all administrative rights" with the BOP. 18 U.S.C. § 3582(c)(1)(A). Surveying the record, there is no evidence that

Rodriguez-Orejuela ever presented a request to the BOP based on this reason—and Rodriguez-Orejuela has already had more than enough time to supplement the record to prove otherwise. Hence, his failure to satisfy the exhaustion requirement is ample reason alone to deny the motion. *See United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020) (denying a motion for compassionate release based on COVID-19 because the defendant must first comply with section 3582's exhaustion requirement—a "glaring roadblock"); *United States v. Holden*, 3:13-cr-00444-BR, 2020 WL 1673440, at *7-10 (D. Ore. Apr. 6, 2020) (similar); *United States v. Clark*, No. CR 17-85-SDD-RLB, 2020 WL 1557397, at *3 (M.D. La. Apr. 1, 2020) (similar); *United States v. Eberhart*, No. 13-cr-00313-PJH-1, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) (similar).

## III. CONCLUSION

Based on the foregoing, Rodriguez-Orejuela's motion for compassionate release is **DENIED**. He fails to carry his burden of proving extraordinary and compelling reasons exist to merit a reduction in his sentence—whether based on his medical conditions or the threat of COVID-19. Furthermore, even were Rodriguez-Orejuela to meet his burden (he does not), the Court finds that his release is not warranted under the section 3553(a) sentencing factors. The Court cannot, in good conscience, release a defendant with a dangerous history of directing others to commit significant crimes on his behalf. Doing so would only undermine the goals of sentencing as prescribed by Congress and threaten the broader principles of justice.

DONE AND ORDERED in Chambers at Miami, Florida, this 28th of April 2020.

_____
FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record